UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ARGONAUT INSURANCE CO.,

                          Plaintiff,                    No. 19-CV-9100 (KMK)

            -v-                                         OPINION & ORDER

TOWN OF GREENBURGH, NEW YORK, *et al.*,

                          Defendants.

Appearances:

Michael F. Metzger, Esq.
William F. Stewart, Esq.
Stewart Smith
West Conshohocken, PA
*Counsel for Plaintiff*

Allan R. Wolff, Esq.
Ethan W. Middlebrooks, Esq.
Anderson Kill P.C.
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

        Plaintiff Argonaut Insurance Co. ("AIC") brings this diversity Action against Defendants

Town of Greenburg (the "Town"), Town Board Supervisor Francis X. Sheehan ("Sheehan"), and

Town Board Member Paul J. Feiner ("Feiner") (collectively, "Defendants") pursuant to the

Declaratory Judgment Act ("DJA"), 28 U.S.C. § 2201(a), seeking a declaration that Plaintiff has

no duty to defend or indemnify Defendants in an underlying federal lawsuit brought by S&R

Development Estates, LLC ("S&R") (the "October 2016 S&R Action" or the "Underlying

Action").  (*See generally* Compl. (Dkt. No. 1).)  Before the Court is Defendants' Motion To

Dismiss or Stay (the "Motion").  (*See* Not. of Mot. (Dkt. No. 28).)  For the following reasons, Defendants' Motion is denied.

## I.  Background

### A.  Factual Background

The following facts, drawn from the Complaint and exhibits attached thereto, are taken as true for purposes of the instant Motion.

#### 1.  The 2007 S&R Action

In May 2006, S&R purchased a 2.3-acre parcel of land located at 1 Dromore Road in the unincorporated Edgemont section of the Town ("the Property").  (Compl. ¶ 22.)[1]  The Property is located in close proximity to Central Avenue, a main thoroughfare, and at the time of purchase, was zoned as part of the Central Avenue Mixed Use Impact District ("CA").  (*Id*. ¶¶ 22–24.) The CA zoning designation allowed for development of multi-family residential complexes, and S&R intended to develop a multi-unit residential complex on the Property.  (*Id.*)

However, after a campaign by several Town officials and members of the public, on February 26, 2007 the Town Department of Community Development and Conservation rezoned the Property from CA to "R-20," classifying the parcel as a "one family residence district" pursuant to the Town Code.  (*Id.* ¶¶ 25–39.)  Following an unsuccessful appeal to the Town's Zoning Board of Appeals ("TZBA"), S&R filed suit on December 7, 2007 in the Southern District of New York against the Town, Feiner, Sheehan, and others, contesting the new zoning designation under several provisions of federal and state law (the "2007 S&R Action").  (*Id.* ¶¶ 40–53.)  On September 26, 2008 the district court dismissed the 2007 S&R Action, ruling that

---

[1] Although Plaintiff provides the address as "1 Dormore Road," (Compl. ¶ 22), documents attached to the Complaint provide the address as "1 Dromore Road (also known as 62 Dromore Road)."  (Compl. Ex. A ("Underlying Action FAC") ¶ 46 (Dkt. No. 1-1).)

S&R's federal claims were not ripe because S&R had not yet applied for a variance following the rezoning, and declining to exercise jurisdiction over the remaining state law claims.  (*Id.* ¶¶ 55.)[2]  At the time, the Town was insured by National Union Insurance Company of Pittsburg, Pa. ("National Union").  (*Id.* ¶¶ 41–42.)  In accordance with its policy, National Union paid for the Town's defense in the S&R 2007 Action.  (*Id.* ¶ 56.)

### 2.  The 2009 S&R Action

On December 18, 2008, S&R petitioned the TZBA for a use variance to build a "four-story, 87-bedroom, multi-family, affordable rental housing development on the Property."  (*Id.* ¶ 57.)  Meeting resistance, on January 27, 2009, S&R initiated an Article 78 proceeding in state court (the "2009 S&R Action") challenging the R-20 zoning designation, and naming the Town, Feiner, and Sheehan, among others, as Defendants.  (*Id.* ¶¶ 61–62; *see also* Compl. Ex. E ("2009 S&R Action Pet.") (Dkt. No. 1-5).)  The Town's resistance continued, and on March 4, 2009, the Town Planning Board ("TPB") asserted that the TZBA could not yet consider issuing a variance because the TPB had a prior "responsibility for making the environmental findings necessary to issue the use variance on . . . the Property."  (*Id.* ¶ 58.)  Accordingly, on March 12, 2009, the TZBA "announced that it would not review S&R's application for a use variance until the TPB made its environmental determinations."  (*Id.* ¶ 59.)  On January 10, 2012, Judge Gerald E. Loehr of the New York Supreme Court, Westchester County, issued a Decision and Order "overturning the [TZBA's] decision that the Property was in the R-20 Zone."  (Compl. ¶ 69.) Moreover, Judge Loehr held that the Town's zoning determination was "not based on evidence

---

[2] The district court opinion can be found at: *S&R Devevelopment Estates, LLC v. Bass*, 588 F. Supp. 2d 452, 463 (S.D.N.Y. 2008).

and was arbitrary and capricious and based on community pressure and bad faith." (*Id.*; Compl. Ex. F. ("January 10, 2012 Order"), at 8 (Dkt. No. 1-6).)

### 3. The Ross Proceeding

Approximately one month later, on February 15, 2012, S&R filed an application for approval of a plan to develop "45 affordable housing units in one multi-family building on the Property." (*Id.* ¶ 73.)  In response, on February 28, 2012, the Town Board unanimously adopted a resolution instructing the Town's Comprehensive Plan Steering Committee ("TCPSC") to review the Town Zoning Map and make "any amendments thereto since 1980 and recommend changes to the Town Board." (*Id.* ¶ 74; *see also* Underlying Action FAC ¶ 143.)  The TCPSC then determined that the Property should have been zoned as R-20 (rather than CA), thus precluding S&R's planned development. (*Id.* ¶ 75.)  Additionally, on March 20, 2012, the Town applied to the Appellate Division for a temporary restraining order to prevent the TBP from addressing S&R's site plan application. (*Id.* ¶ 77.)  The Appellate Division denied the Town's request on April 4, 2012. (*Id.* ¶ 78.)

One month later, on May 4, 2012, four residents of the Scarsdale Woods Condominiums ("Scarsdale Woods"), a complex adjoining the Property, commenced an Article 78 proceeding ("the Ross Proceeding") against the Town, the TPB, and S&R, claiming "to be aggrieved by Judge Loehr's Decision and Order in the [2009 S&R] Action." (*Id.* ¶ 79.)  In particular, the Scarsdale Woods residents "sought an injunction to halt the Town Planning Board's review of S&R's site plan for affordable multi-family housing on the neighboring Property." (*Id.*)  Additionally, on May 17, 2012, the Edgemont Community Council ("ECC"), a community activist group opposed to S&R's development plans for the Property, held a meeting with Sheehan, Feiner, and several other Town officials among the attendees. (*Id.* ¶ 80.)  As later

alleged by S&R, during the ECC meeting, Feiner stated that "[he] would support the Scarsdale Woods petitioners." (*Id*. ¶ 81; Underlying Action FAC ¶ 152.) Further, Feiner allegedly asserted that despite Judge Loehr's Order, "the Town was moving ahead" with its "second attempt to change the . . . official zoning status of the Property from CA to R-20 and expected adoption of that change in July 2012." (Compl. ¶ 82; Underlying Action FAC ¶ 152.) He further stated that the Town's goal was to "make sure that the school district is protected," and that "the entire Town Board has directed the Town Attorney, the Town Attorney's office, to do everything possible to make sure that we are successful. We want to make sure it is not a multiple dwelling use." (Compl. ¶ 83; Underlying Action FAC ¶ 153.)

On May 25, 2012, the Town Board held a special meeting to consider, inter alia, changes to the zoning map and the Town Code to facilitate blocking the S&R development. (Compl. ¶ 84.) At the TPB meeting on June 20, 2012, S&R delivered a "detailed presentation of its site plan for developing the Property as multi-family affordable housing." (*Id*. ¶ 85.) However, as later alleged by S&R, the TPB "directed S&R to undertake numerous time consuming and expensive tasks as a condition of continuing to review its site plan" in order to delay and provide "ample time to effect the rezoning of the Property." (*Id*. ¶ 86; Underlying Action FAC ¶ 157.) S&R also alleges that in June 2012, the Town Attorney "conceded to S&R that he and the Town's staff thought that multi[-]family housing was an appropriate use of the Property but stated that politics and the Town Board's decision-making were being driven by Edgemont's opposition of the Development." (Compl. ¶ 87; *see also* Underlying Action FAC ¶ 158.) On July 18, 2012, the TPB approved rezoning the Property from CA to R-20. (*Id*. ¶ 88.)

In November 2012, Judge Loehr granted S&R's motion to dismiss the Scarsdale Woods residents' petition, finding that their claims were "barred by collateral estoppel and that the

Town's recent second re-zoning of the Property to R-20 was ineffective." (*Id.* ¶ 90.) On February 19, 2013 the Town appealed that ruling. (*Id.* ¶ 91.) The same day, the Appellate Division denied the Town's application to stay Judge Loehr's orders in both the Ross Proceeding and the 2009 S&R Action. (*Id.* ¶ 92.) On April 10, 2013, the Appellate Division denied the Town's appeal of Judge Loehr's dismissal of the Scarsdale Woods residents' petition, thus concluding the Ross Proceeding. (*Id.* ¶ 93.) On December 26, 2013, the Appellate Division similarly denied the Town's appeal of Judge Loehr's January 10, 2012 Order (in the 2009 S&R Action), thereby "affirm[ing] Judge Loehr's holding that the [S&R] Property was in the CA Zone for multi-family housing." (*Id.* ¶ 94.)

### 4.  The January 2013 S&R Action

On January 11, 2013, S&R filed another state court action in New York Supreme Court, Westchester County, its third lawsuit against the Town, Feiner, and Sheehan (the "January S&R 2013 Action"). (*Id.* ¶¶ 95–96.)[3] S&R alleged that the Town, Feiner, Sheehan and others engaged in a continuous effort to block S&R's development of the Property despite judicial orders, including through manipulation of the zoning map. (*Id.* ¶¶ 97–104; *see also* Compl. Ex. I ("January 2013 Verified Pet.") ¶¶ 3, 11–117 (Dkt. No. 1-9).) On August 13, 2013, Judge Susan Cacace ruled that the Town's rezoning of the Property violated S&R's rights as determined by Judge Loehr in the 2009 S&R Action, and that the Town's actions were "arbitrary and capricious and in bad faith." (Compl. ¶ 106; *see also* Compl. Ex. J ("August 12, 2013 Order"), at 6 (Dkt. No. 1-10).) On August 21, 2013, the Town appealed Judge Cacace's Order. (*Id.* ¶ 107.) During the pendency of this appeal, the TPB continued to postpone approval of S&R's site plan.

---

[3] *See S&R Dev. Estates, LLC v. Feiner, et al.*, New York Supreme Court, Westchester County, Index No. 1099/2013.

(Compl. ¶ 108; Underlying Action FAC ¶ 189.)  Eventually, on October 14, 2015, the Appellate Division unanimously affirmed Judge Cacace's August 13, 2013 Order.  (Compl. ¶ 109.)

### 5.  The May 2013 S&R Action

During the litigation of the January 2013 S&R Action, the TPB "adjourned indefinitely the scheduled continued public hearing on S&R's application for site plan approval," explaining that the zoning of the Property is "not free from doubt."  (*Id.* ¶ 111; Underlying Action FAC ¶ 184.)  On May 15, 2013, shortly after the TPB denied S&R's request to restore S&R's site plan to the calendar for its May 15, 2013 meeting, S&R filed its fourth lawsuit against the Town (the "May S&R 2013 Action.").  (*Id.* ¶ 114.)  In this suit, S&R argued that the Town's delay violated numerous court decisions and was arbitrary and capricious; S&R therefore sought an order pursuant to Article 78 compelling the TPB to continue its review of S&R's site plan.  (*Id.* ¶¶ 112–17.)  In response, the Town argued that Judge Loehr's prior orders "did not necessarily abrogate" its zoning decisions, and that it was not obligated to conclude the public hearing on S&R's development plan or proceed with a vote.  (*Id.* ¶¶ 118–19.)

### 6.  The July 2013 S&R Action

In addition to its rezoning efforts, the Town also attempted to thwart S&R's development by invoking a restrictive covenant in the Property's original deed.  (*Id.* ¶ 122.)  This deed, which dates to 1912 and created the parcel which is now the Property, contained a covenant prohibiting the erection of a "tenement or flat house so called."  (*Id.* ¶¶ 123–24; *see also* Underlying Action FAC ¶ 190.)  Thus, on February 18, 2013, the ECC's then-Director, Robert B. Bernstein, urged the TPB to reject S&R's development application in part because of the restrictive covenant. (Compl. ¶ 124.)  Approximately two weeks later, on March 4, 2013, ECC announced at a meeting that the restrictive covenant could be enforced by the Sisters of the Blessed Sacrament

7

("the Sisters"), a Roman Catholic religious order, owners of a lot adjacent to S&R's Property.

(*Id.* ¶¶ 125–26.) As later alleged by S&R, members of the ECC and other opponents of the S&R

development persuaded the Sisters to threaten litigation to enforce the covenant against S&R.

(*Id.* ¶¶ 127–28.) On July 22, 2013, following receipt of a formal letter containing the Sisters'

threat, S&R filed its fifth lawsuit against the Town (the "July 2013 S&R Action"), seeking a

judgment, pursuant to Article 19 of the New York Real Property Actions & Proceedings Law

("RPAPL"), declaring the restrictive covenant unenforceable and precluding the Town from

blocking the development. (*Id.* ¶¶ 129–133.) On February 7, 2014, Judge Orazio Bellantoni of

the New York Supreme Court, Westchester County, dismissed the July 2013 S&R Action

without prejudice on the grounds that the Town's appeal of Judge Cacace's August 13, 2013

Order was still pending, and that the dispute over the restrictive covenant was therefore not ripe

for judicial consideration. (*Id.* ¶ 135.)

### 7. The March 2016 S&R Action

On January 6, 2016, six weeks after the Appellate Division affirmed Judge Cacace's

Order in the January 2013 S&R Action (and nine years after S&R's first site plan submission),

the TBP finally approved S&R's planned development of the Property. (*Id.* ¶¶ 137–38.)

However, prior to the TPB vote approving the development, TPB Member Michael Golden

stated that the S&R site plan was "terrible" and that he "hope[d] it w[ould] never be built," and

he successfully struck two proposed "findings" that would have found the development

"consistent with the surrounding area" and an "overall enhancement to the site and general area."

(*Id.* ¶ 141; *see also* Underlying Action FAC ¶ 206.) As alleged by S&R, the removal of these

findings was meant to facilitate future resistance to and delay of the S&R development. (*See*

Compl. ¶ 141; *see also* Underlying Action FAC ¶ 208.)

Relatedly, at a December 2, 2015 meeting of the TPB, the Sisters requested that the TBP stay any approvals of S&R's planned development "pending determination of the restrictive covenant issue." (*Id.* ¶ 143.) As alleged by S&R, Golden struck the proposed findings at the January 6, 2016 meeting in response to a request from ECC members, who were working with the Sisters to block the S&R development. (*See* Underlying Action FAC ¶¶ 207–08.) Consequently, on March 4, 2016, S&R refiled its July 2013 S&R Action, again seeking to extinguish the restrictive covenant. (Compl. ¶ 145.) This suit was scheduled for trial in October 2019. (*Id.* ¶ 150.) However, on October 7, 2019, S&R and the Town stipulated to the mootness and dismissal of the March 2016 S&R Action. (*See* Stipulation of Discontinuance as to Defendant Town of Greenburg (Doc. No. 369) (*S&R Dev. Ass. v. Town of Greenburg*, Westchester Supreme Court, Index No. 52747/2016).)

### 8.  The October 2016 S&R Action

In anticipation of a September 28, 2016 meeting of the Town Board, Town Board Member Richard Troy sent an email to the Town Board and the TCPSC stating that the TCPSC's continued depiction of the Property as R-20 in its Draft Comprehensive Plain violated court orders and demonstrated "the Town's bad faith." (Compl. ¶ 151.) As alleged by S&R, Town officials responded that same day with a phone call to Troy, acknowledging that S&R could bring another suit if the Plan was approved "as is." (*Id.* ¶ 152.) Following the September 28, 2016 meeting, the Town adopted a Comprehensive Plan that again designated the Property as R-20 rather than CA, and that removed an earlier draft's "encouragement of small areas for multi-family housing." (*Id.* ¶¶ 153–54.) On October 14, 2016, S&R therefore filed the Underlying

Action (its seventh lawsuit overall) in the Southern District of New York, naming the Town, the Town Board, the TPB, the TZBA, Feiner, and Sheehan as defendants. (*Id.* ¶¶ 153, 159.)[4]

In the Underlying Action, S&R claims that "it has repeatedly requested the Town amend the Official Town Zoning Map to reflect zoning of the Property as CA," as directed by prior court orders, and that the Town's persistent mislabeling of the Property has harmed S&R, including by impeding its ability to obtain a mortgage loan secured by the Property. (*Id.* ¶¶ 155–56.) S&R further alleges that despite the TPB's approval of its site plan, "the Town has blocked the issuing of permits and approvals needed for" the planned construction. (*Id.* ¶ 157.) S&R further alleges that it suffered "nearly a decade of ongoing harm" due to the Town's "bad-faith efforts to block the Development." (Underlying Action FAC ¶¶ 241–42; *see also* Compl. ¶ 164.) S&R therefore claims violations of the Fair Housing Act, the Equal Protection Clause, and the Due Process Clause, and seeks damages "for the loss of use of the property from February 26, 2007" as well as an injunction restraining Defendants from preventing construction of affordable multi-family housing on the Property. (*Id.* ¶¶ 166–79.)

On January 26, 2017, the Town finally changed the Property's zoning designation from R-20 to CA. (*Id.* ¶ 163.) On July 6, 2017, Defendants filed a motion to dismiss in the Underlying Action, arguing, inter alia:

> The dispute between the Town and S&R started a decade ago . . . . This dispute has been the subject of three Article 78 proceedings filed by S&R in New York Supreme Court (and a fourth filed by residents of adjoining property). Nevertheless, S&R now seeks to

---

[4] The Underlying Action is currently pending before Judge Seibel; both sides in that action filed motions for summary judgment earlier this year. *See* Dkt. (*S&R Dev. Estates, LLC v. Town of Greenburgh, New York,* No. 16-CV-8043 (S.D.N.Y.).)

embroil this Court in the dispute . . . to challenge actions by the Town which have already been reviewed in the prior Article 78 proceedings.

(*Id.* ¶ 182; *see also* Compl. Ex. Q ("Underlying Action Defs.' Mem."), at 1–2 (Dkt. No. 1-17).) On September 20, 2017, Judge Seibel denied the Town's motion to dismiss, explaining that S&R "plausibly allege[s] that the blocking of [its] development is part of the Town's decade-long effort to keep select neighborhoods and the prized Edgemont School District from having to integrate with lower income, mostly minority residents with children who would live in affordable housing."  (Compl. ¶ 188; *see also* Compl. Ex. V ("Judge Seibel Dismissal Decision Transcript") 31:09–14 (Dkt. No. 1-22).)

### 9.  The AIC Policy

During the course of the extensive litigation detailed above, Plaintiff issued the Town an insurance policy (the "AIC Policy" or "the Policy") effective for the period December 31, 2015 to December 31, 2016.  (Compl. ¶¶ 9, 191–92; *see also* Compl. Ex. X ("AIC Policy") (Dkt. No. 1-24).)[5]  The AIC Policy provides several categories of insurance coverage, including, as relevant here, Public Risk General Liability ("PRGL") and Public Officials Liability ("POL") coverage.  (Compl. ¶ 193.)  Both categories provide coverage to the Town's agencies, boards and commissions, and members of the same acting in their official capacities (the "Insureds") for certain categories of conduct occurring after December 31, 2012.  (*Id.* ¶¶ 198–99, 300.)  In fact, the Policy states explicitly that coverage does not "apply to claims which arose from a 'wrongful act' commencing before . . . 12/31/2012."  (AIC Policy 15.)

---

[5] All citations to the AIC Policy refer to the page number appearing at the bottom right hand corner of the document.  Although not directly relevant here, the AIC Policy was the renewal of a prior policy originally covering the period December 31, 2014 to December 31, 2015; the same Policy was subsequently renewed for the policy periods December 31, 2016 to December 31, 2017, and December 31, 2017 to December 31, 2018.  (*See* Defs.' Mem. of Law in Supp. of Mot. ("Defs.' Mem.") 1 (Dkt. No. 28).)

### a.  Public Risk General Liability Coverage

The PRGL portion of the Policy provides coverage for sums (in excess of a specified limit) that the Insureds become liable for as a result of "property damage" and certain other forms of liability.  (*Id.* at 18).[6]  Crucially, the Policy states that coverage will apply "only if prior to the policy period, no [I]nsured . . . knew or had reason to know the . . .  property damage . . . occurred, was committed or took place, in whole or in part."  (*Id.* at 19 (quotation marks omitted).)  Moreover, if any [I]nsured "knew or had reason to know, prior to the policy period that the . . . property damage occurred, was committed, or took place in, in whole or in part, then any continuation, change, or resumption of such . . . property damage, will be deemed to have been known prior to the policy period."  (*Id.*)  Damage will be deemed to have been known when any Insured gives or receives notice of a claim, loss, offense, or occurrence or becomes aware "by any other means" of the same.  (*Id.*)  The Policy also provides that Plaintiff has "no duty to defend" an Insured against any "suit" seeking "loss" for "property damage" to which this insurance does not apply.  (*Id.* at 21).[7]

### b.  Public Officials Liability Coverage

The POL portion of the Policy provides coverage for sums (in excess of a specified amount) that an Insured "becomes legally obligated to pay as 'loss' resulting from a 'public

---

[6] "Property damage" is defined as "[p]hysical injury to tangible property, including all resulting loss of use of that property," or "[l]oss of use of tangible property that is not physically injured.  All such loss shall be deemed to occur at the time of the 'occurrence' that caused it." (AIC Policy 51.)  "Occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  (*Id.* at 49.)

[7] The Policy defines a "suit" as "any civil proceeding in which 'loss' because of 'bodily injury,' 'property damage,' 'personal or advertising injury' or 'employee benefit wrongful act(s)' to which this insurance applies are alleged," and includes arbitration and other alternative dispute resolution proceedings, but not administrative hearings or proceedings.  (AIC Policy 51–52.)  Similarly, "loss" or "losses" are defined as "any monetary amount that an [I]nsured is legally

officials wrongful act' to which this insurance applies." (*Id.* at 88.)[8]  However, the coverage applies only to "liability for claims *first* made against [the Insured] while the coverage is in force." (*Id.* (emphasis added).)  The Policy further specifies that AIC's obligation under these provisions applies only if the wrongful act did not commence before December 31, 2012, and if the claim is "first made against the [I]nsured during the 'policy period.'" (*Id.*)  By contrast, if prior to the policy period "any [I]nsured knew or had reason to know" that the POWA had commenced, then "any continuation, change, or resumption of such [POWA] will be deemed to have been known prior to the 'policy period.'" (*Id.*)  Additionally, the POWA will be "deemed to have been known to have commenced at the earliest time" that any Insured reports any part of the POWA to Plaintiff or another insurer, receives written or verbal demand because of the POWA, or becomes aware "by any other means" that the POWA has commenced. (*Id.* at 89.)  The Policy further provides that "[t]he entire [POWA] will be deemed to have been committed on the date of the first act, error, or omission," and that all claims deriving from such a POWA "will be deemed to have been made the time the first of such 'claims' is made, regardless of the number of 'claims' subsequently made." (*Id* at 89.)  The Policy also contains an additional far-reaching exclusion, excluding from coverage any injury or loss "based upon, arising out of, or attributable to or in any way directly or indirectly related to any . . . [p]rior or pending legal action or litigation against the insured before" December 31, 2012. (*Id.* at 90, 94.)  Finally, the

---

obligated to pay for a 'claim' made against the [I]nsured for . . . 'property damage' . . . covered under this policy, including but not limited to amounts for injuries, damages, judgments, settlements and awards." (*Id.* at 48.)

[8] A "public officials wrongful act" (or "POWA") is defined as "any actual or alleged . . . error or omission, neglect or breach of duty by an insured; [v]iolation of civil rights protected under 42 USC 1981[; or v]iolation of state civil rights law[] which arises out of the discharge of duties for you individually or collectively." (AIC Policy 107).

Policy makes clear that Plaintiff has "no duty to defend an [I]nsured against any 'suit' seeking

'loss' for a [POWA] to which this insurance [policy] does not apply." (*Id.* at 90.)

### 10.  The Town Seeks Coverage

On March 24, 2016, the Town reported the March 2016 S&R Action to Plaintiff.

(Compl. ¶ 184.)  On April 4, 2016, Trident Public Risk Solutions ("Trident"), Plaintiff's

authorized claims representative, responded with a letter explaining that the Policy did not cover

the claims in the March 2016 S&R Action because (among other reasons) these claims were

related to prior legal actions that predated the Policy.  (*Id.* ¶ 185.)  On October 17, 2016

Defendants filed similar claims with respect to the Underlying Action, and on October 26, 2017

Trident responded, again denying coverage on behalf of Plaintiff.  (*Id.* ¶¶ 186–87.)  Plaintiff now

seeks a declaratory judgment confirming that it has no duty to defend or indemnify Defendants

with respect to the claims asserted in the Underlying Action.  (*See generally* Compl.)[9]

### B.  Procedural History

On October 1, 2019, Plaintiff filed its Complaint.  (*See* Compl.)[10]  On November 22,

2019, Defendants filed a Letter to the Court requesting a pre-motion conference in anticipation

---

[9] As noted above, Defendants initially requested coverage for claims asserted in the March 2016 S&R Action, and Plaintiff's Complaint thus requests a declaratory judgment with respect to that Action as well.  However, Defendants subsequently waived their claim for coverage of the March 2016 S&R Action.  (*See* Dkt. No. 21 at 1 n.1 ("The Town gave notice of that claim to AIC, but it is not seeking insurance coverage for it."); *see also* Pl.'s Mem. of Law in Opp'n to Mot. ("Pl.'s Mem.") 3 n.1 (noting the waiver) (Dkt. No. 30).)  Accordingly, the Court deems Plaintiff's request for a declaratory judgment as to the March 2016 S&R Action moot.

[10] Plaintiff filed a statement of relatedness on October 1, 2019, which described the instant case as related to the Underlying Action, currently pending before Judge Seibel.  (*See* Dkt. No. 7.)  Plaintiff also indicated that the instant case is related to the 2007 S&R Action, which Judge Conner dismissed without prejudice on September 26, 2008.  (*See id.*)  Nevertheless, the case was assigned to the undersigned District Judge.

of filing a motion to dismiss, and in the alternative, a motion to stay the matter pending further adjudication and resolution of the Underlying Action.  (*See* Dkt. No. 21.)  Five days later, Plaintiff filed a responsive Letter.  (*See* Dkt. No. 22.)  On January 9, 2020, after a pre-motion conference, the Court entered a Scheduling Order for the instant Motion.  (Dkt. No. 26.)  On February 11, 2020, Defendants filed the instant Motion and accompanying papers.  (Not. of Mot.; Defs.' Mem.; Decl. of Allen R. Wolff, Esq. in Supp. of Mot. ("Wolff Decl.") (Dkt. No. 29).)  On March 11, 2020, Plaintiff filed its Opposition.  (*See* Pl.'s Mem.)  On April 15, 2020, Defendants filed their Reply.  (*See* Defs.' Reply Mem. of Law in Further Supp. of Mot. ("Defs.' Reply") (Dkt. No. 33).)

## II.  Discussion

### A.  Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his [or her] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement."  *Id.* (alteration and quotation marks omitted).  Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.  Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that

15

is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his] claims across the line from

conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679

("Determining whether a complaint states a plausible claim for relief will . . . be a context-

specific task that requires the reviewing court to draw on its judicial experience and common

sense.  But where the well-pleaded facts do not permit the court to infer more than the mere

possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader

is entitled to relief.'"  (second alteration in original) (citation omitted) (quoting Fed. R. Civ. P.

8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the

hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery

for a plaintiff armed with nothing more than conclusions.").

     "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the

factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and

"draw[] all reasonable inferences in favor of the plaintiff," *Daniel v. T & M Prot. Res., Inc.*, 992

F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145

(2d Cir. 2012)).  Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must

confine its consideration to facts stated on the face of the complaint, in documents appended to

the complaint or incorporated in the complaint by reference, and to matters of which judicial

notice may be taken."  *Leonard F. v. Isr. Disc. Bank of New York*, 199 F.3d 99, 107 (2d Cir.

1999) (quotation marks omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d 306, 317

(S.D.N.Y. 2016) (same).

     B.  Analysis

     Defendants argue, *inter alia*, that the instant Action should be dismissed or stayed as

premature because the declaration Plaintiff seeks necessarily depends on unresolved questions of

fact in the Underlying Action.  (*See generally* Defs.' Mem.)  By contrast, Plaintiff argues that the

inapplicability of the Policy is apparent from the Policy itself, as well as from the complaint in

the Underlying Action and other documents of which the Court may take judicial notice.  (*See*

*generally* Pls.' Mem.)  Because the Court agrees that specific language in the Policy (as applied

to the claims in the Underlying Action) would support a declaratory judgment regardless of

further factual determinations, the Court need not address the panoply of additional possible

bases for a declaratory judgment advanced by Plaintiff and hotly contested by Defendants.

### 1.  Determining the Duty to Defend and Duty to Indemnify

Under New York law, "[a]n insurer has distinct duties to indemnify and to defend its

insured.  The duty to defend is broader than the duty to indemnify." *Atl. Cas. Ins. Co. v. Value*

*Waterproofing, Inc.*, 918 F. Supp. 2d 243, 252 (S.D.N.Y. 2013) (citation omitted), *aff'd sub nom.*

*Atl. Cas. Ins. Co. v. Greenwich Ins. Co.*, 548 F. App'x 716 (2d Cir. 2013); *see also Euchner-*

*USA, Inc. v. Hartford Cas. Ins. Co.*, 754 F.3d 136, 140 (2d Cir. 2014) ("In New York, an

insurer's duty to defend is 'exceedingly broad' and distinct from the duty to indemnify." (citation

omitted)).  "The duty to defend generally is triggered by the filing of a lawsuit, whereas the duty

to indemnify generally is triggered by a determination of liability." *Lafarge Can. Inc. v. Am.*

*Home Assurance Co.*, No. 15-CV-8957, 2018 WL 1634135, at *4 (S.D.N.Y. Mar. 31, 2018)

(citations and quotation marks omitted).  Thus, "[t]o ascertain whether the duty to defend has

been triggered, a court will ordinarily compare the allegations of the complaint to the insurance

policy's terms." *Atl. Cas.*, 918 F. Supp. 2d at 252 (citations omitted); *see also Burt Rigid Box,*

*Inc. v. Travelers Prop. Cas. Corp.*, 302 F.3d 83, 97 (2d Cir. 2002) ("An insurer's duty to defend

is broader than its duty to indemnify and is generally determined by comparing the allegations of

the complaints to the terms of the relevant policies.").  By contrast, the duty to indemnify "turns

not on the allegations of the complaint but on the actual liabilities as borne out by the facts." *Lafarge*, 2018 WL 1634135, at \*5 (citation and quotation marks omitted).

"[W]here allegations in a complaint fall within the scope of the risks undertaken by the insurer, regardless of how false or groundless those allegations might be, there is a duty to defend." *Century 21, Inc. v. Diamond State Ins. Co*., 442 F.3d 79, 82 (2d Cir. 2006) (citation and quotation marks omitted). "[U]ntil it is determined with certainty that the policy does not provide coverage," the duty to defend persists. *W. Heritage Ins. Co. v. Jacobs Dev. Corp.*, No. 12-CV-5718, 2014 WL 297792, at \*4 (E.D.N.Y Jan. 27, 2014) (emphasis and quotation marks omitted) (citing *Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 620 (2d. Cir. 2001)). "An insurer's duty to defend, however, ends if it establishes as a matter of law that there is no possible factual or legal basis on which it might eventually be obligated to indemnify its insured under any policy provision." *Burt Rigid Box*, 302 F.3d at 97 (citation and quotation marks omitted). With respect to both duties, "to negate coverage by virtue of an exclusion, an insurer must establish that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case and that its interpretation of the exclusion is the only construction that [could] fairly be placed thereon." *Parks Real Estate Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 42 (2d Cir. 2006) (alteration in original) (citation and quotation marks omitted). Moreover, "any ambiguity must be resolved in favor of the insured and against the insurer." *Id.* (citations and quotation marks omitted).

## 2. Application

As Defendants acknowledge, only two parts of the larger AIC Policy provide possible sources of coverage for the Underlying Action: the PRGL Policy and the POL Policy. (*See* Defs.' Mem. 8.)  The Court addresses each in turn.

### a.  POL Coverage

In the first section of the POL Policy, the Policy provides that Plaintiff's "obligation under this insuring agreement only applies if . . . the [POWA] did not commence before" December 31, 2012, and if a related claim is "first made against the [I]nsured during the 'policy period.'"  (AIC Policy 88.)  Moreover, such coverage applies only if "no [I]nsured knew or had reason to know that the [POWA] had commenced" at that time.  (*Id.*)  Additionally, if "any [I]nsured knew or had reason to know, prior to the policy period that a [POWA] had commenced, then any continuation, change or resumption of such [POWA] will be deemed to have been known prior to the policy period."  (*Id.* (quotation marks omitted).)  The Policy further provides that "[t]he entire [POWA] will be deemed to have been committed on the date of the first act, error or omission."  (*Id.* at 89.)  Moreover, "all claims arising out of a [POWA] will be deemed to have been made at the time the first of such 'claims' is made, regardless of the number of 'claims' subsequently made."  (*Id.*)  Finally, the Policy excludes from coverage any injury or loss "based upon, arising out of, or attributable to or in any way directly or indirectly related to any . . . [p]rior or pending legal action or litigation" before December 31, 2012.  (*Id.* at 90, 94.)

Regardless of future factual determinations in the Underlying Action, the above language "clear[ly] and unmistakabl[y]" precludes POL coverage for all claims, *Parks Real Estate*, 472 F.3d at 42 (citation and quotation marks omitted), for at least three reasons.  First, the claims in the Underlying Action were *not* "first made against the [I]nsured during the policy period."  (*Id.* at 88.)  Rather, they were first made as far back as 2007.  As the Policy makes clear, "all claims arising out of a [POWA] will be deemed to have been made at the time the first of such 'claims' is made, regardless of the number of 'claims' subsequently made."  (AIC Policy 89.)  Here, each

19

of S&R's claims in the Underlying Action relies on the allegation that Defendants have continued to block and delay S&R's development on the Property since 2007.  (*See* Underlying Action FAC ¶¶ 266, 274, 281, 293, 296, 303, 309, 322, 330, 341).  However, in the years prior to December 31, 2012, S&R filed several claims arising out of the same alleged effort to block and delay S&R's development.  For example, in the 2007 S&R Action, S&R alleged that Defendants "conspired to unlawfully prevent S&R from developing" the Property.  (*See* Compl. Ex. C ("2007 S&R Action Am. Compl."), at 1 (Dkt. No. 1-3).)  Similarly, in the 2009 S&R Action, S&R alleged (and Judge Loehr concluded) that Defendants acted "arbitrar[ily] and capricious[ly]" to "wrongfully deprive S&R of its rights, as owner, to develop affordable multi-family housing" on the Property.  (*See* 2009 S&R Action Pet. ¶ 1; *see also* January 10, 2012 Order 9.)  Therefore, as "all claims arising out of" Defendants' lengthy efforts to block S&R's development "will be deemed to have been made at the time the first of such 'claims' is made," (AIC Policy 89), all claims in the Underlying Action are "deemed to have been made" in 2007.  Accordingly, because the Policy applies only if a claim is "first made against the [I]nsured during the policy period," the Policy does not apply to any of the claims in the Underlying Action.[11]

---

[11] Defendants counter that S&R's several Actions do not arise out of a single alleged effort to stall the Property development, but rather several "discrete events." (Defs.' Mem. 5.) Moreover, Defendants maintain that the Underlying Action raises novel claims not contained in prior actions, for example, Fair Housing Act violations for discrimination on the basis of race and familial status.  (*Id.*)  Under the Policy, however, neither the periodic renewal of Defendants' attempts to block S&R, nor the precise legal nature of recent claims is relevant.  Rather, the Policy provides that "[t]he entire POWA will be deemed to have been committed on the date of the first act, error, or omission," and that all claims deriving from such a POWA "will be deemed to have been made the time the first of such 'claims' is made, regardless of the number of claims subsequently made."  (*Id* at 89.)  Moreover, a "POWA" is defined as "any actual or *alleged* . . . error or omission . . . which arises out of the discharge of duties."  (*Id.* at 107 (emphasis added).)  Thus, under the Policy, whether a claim relates back to previous claims turns on the factual *allegations* supporting such claims, not the actual facts or precise legal theory.  Accordingly, as

Second, under the Policy, Defendants "knew or had reason to know that the [POWA] had commenced." (*Id.* at 88.) In particular, the Policy provides that a POWA "will be deemed to have been known to have commenced at the earliest time when any Insured [r]eceives written or verbal demand or 'claim' for 'loss' because of a [POWA]." (*Id.* at 89.) Here, several Defendants were named as defendants in (and then contested) several lawsuits that preceded December 31, 2012, including the 2007 and 2009 S&R Actions. (*See* Compl. ¶¶ 44–69.) In contesting these lawsuits, Defendants "[r]eceived written or verbal demand[s]" for losses suffered "because of" Defendants' alleged efforts to block the development; accordingly, their alleged conduct must "be deemed to have been known or commenced" (at least) at the time they received notice of these lawsuits. (AIC Policy 89.) Thus, because coverage applies only if "no [I]nsured knew or had reason to know that the [POWA] had commenced" prior to December 31, 2012, and because Defendants must be deemed to have had such knowledge by virtue of having been served and contested these lawsuits, POL coverage does not apply. (*Id.*)

Third, the Policy excludes from coverage any injury or loss "based upon, arising out of, or attributable to or in any way directly or indirectly related to any . . . [p]rior or pending legal action or litigation" before December 31, 2012. (*Id.* at 90, 94.) Here, the Underlying Action is clearly "directly or indirectly related" to the earlier S&R lawsuits against Defendants. As explained above, the core conduct underlying the S&R suits is substantially the same; all such claims focus on Defendants' lengthy efforts to inhibit S&R's development of the Property. Accordingly, the Underlying Action is "derived in whole or in part from the facts and/or matters

---

the alleged conduct (and certainly the "first act, error or omission") that forms the basis of the Underlying Action is the same as the alleged conduct underlying the 2007 Action (as well as other Actions prior to December 31, 2012), the claims in the Underlying Action must be "deemed to have been made" in 2007, regardless of whether the conduct periodically paused and resumed, and regardless of the novelty of any particular legal theory in the Underlying Action.

averred or alleged in [a] . . . prior litigation." (*Id.* at 94.)  Indeed, Defendants have themselves acknowledged the relationship between the Underlying Action and preceding suits, even arguing in the Underlying Action that "[t]he dispute between the Town and S&R started a decade ago . . . [and] has been the subject of three Article 78 proceedings filed by S&R in New York Supreme Court." (*Id.* ¶ 183; *see also* Underlying Action Defs.' Mem. 1–2.)  In light of the capacious language of the Policy's exclusion of coverage for claims "in any way directly or indirectly related" to prior litigation, the Court concludes the Policy clearly precludes POL coverage for any losses claimed in the Underlying Action.

Finally, as the Policy makes clear that Plaintiff has "no duty to defend an [I]nsured against any suit seeking loss for a [POWA] to which this insurance [policy] does not apply," (AIC Policy 90), the above analysis is also determinative of, and decisively precludes, any duty to defend, *see United Specialty Ins. Co. v. CDC Hous., Inc.*, 233 F. Supp. 3d 408, 413 (S.D.N.Y. 2017) (explaining that policy language providing that the insurer "will have *no* duty to defend the insured against any 'suit' seeking damages for 'bodily injury' or 'property damage' to which this insurance does not apply" was unambiguous, and therefore holding that an insurer had "no duty to defend or indemnify" the defendant in the underlying action (record citation and some quotation marks omitted)); *Century Sur. Co. v. Franchise Contractors, LLC*, No. 14-CV-277, 2016 WL 1030134, at *8–13 (S.D.N.Y. Mar. 10, 2016) (explaining that because an insurance policy unambiguously denied coverage for an alleged injury, the insurer had no duty to defend or indemnify the insured).

### b.  PRGL Coverage

PRGL coverage is similarly inapplicable.  While the Policy provides PRGL coverage for an Insured's liability for "property damage," such coverage applies only if prior to the policy

period, no Insured "knew or had reason to know" that the property damage "occurred, was committed or took place, in whole or in part." (AIC Policy 18–19.) Moreover, the Policy provides that such damages "will be deemed to have been known to have occurred at the earliest time when any [I]nsured . . . [r]eceives a written or verbal demand or claim for loss because of" the property damage. (*Id.* at 19.) As the Court has already explained with respect to POL coverage, several Defendants were named as defendants, and contested, several lawsuits that preceded December 31, 2012, including the 2007 S&R Action. (*See* Compl. ¶¶ 44–69.) These suits alleged (arguable) "property damage" in the form of "the loss of use of the Property, from February 26, 2007" due to Defendants' stonewalling of their planned development. (*See, e.g.*, 2007 S&R Action Am. Compl. ¶ 134(1)(a).)[12] Accordingly, such damage is "deemed to have been known" at least at the moment that Defendants received the lawsuit. (AIC Policy 19.) Of course, this alleged damage is precisely the same damage that S&R alleges in the Underlying Action. (*See* Underlying Action FAC ¶ 344(1) (citing "loss of use of the Property, from February 26, 2007").) Thus, because Defendants are deemed to have known of the relevant alleged property damage "in whole or in part" prior to December 31, 2012, the Policy does not provide coverage. (AIC Policy 18–19.) Finally, as with POL coverage, because the PRGL Policy does not apply to any possible liability in the Underlying Action, the Policy also disclaims any duty to defend against such claims. (*See id.* at 21 ("We will have no duty to defend an [I]nsured against any 'suit' seeking 'loss' for . . . property damage . . . to which this insurance does not apply.").) Thus, the Court concludes that, as with POL coverage, the PRGL portion of

---

[12] As with Plaintiff's other arguments supporting its request for a declaratory judgment, the Court need not, and does not, address Plaintiff's argument that S&R's alleged loss of use in the Property is not "property damage," and was not caused by an "occurrence" within the meaning of the Policy. (*See* Compl. ¶¶ 215–25; Pl.'s Mem. 20–21.)

the Policy excludes coverage of the claims in the Underlying Action "in clear and unmistakable language, [and] is subject to no other reasonable interpretation." *Parks Real Estate*, 472 F.3d at 42 (citation and quotation marks omitted); *see also United Specialty Ins.*, 233 F. Supp. 3d at 413 (finding, based on substantially similar policy language, that an insurer had "no duty to defend or indemnify" the defendant in the underlying action).

Accordingly, after "compar[ing] the allegations of the complaint [in the Underlying Action] to the insurance policy's terms," the Court concludes that the Policy does not apply to the claims asserted in the Underlying Action. *Atl. Cas.*, 918 F. Supp. 2d at 252 (citations omitted). In other words, by examining the Policy and relevant complaints, the Court is able to determine that, regardless of any fact development in the Underlying Action, "there is no possible factual or legal basis on which it might eventually be obligated to indemnify its insured under any policy provision." *Burt Rigid Box*, 302 F.3d at 97 (citation and quotation marks omitted).

### 3. Ripeness

The above analysis necessarily resolves Defendants' ripeness arguments. In general, courts recognize two distinct "ripeness" concepts: "constitutional and prudential." *Ahmed v. Cissna*, 327 F. Supp. 3d 650, 662 (S.D.N.Y. 2018) ("There are two forms of ripeness: constitutional and prudential." (citation and quotation marks omitted)), *aff'd sub nom. Ahmed v. Cuccinelli*, 792 F. App'x 908 (2d Cir. 2020). However, as Defendants acknowledge, "[o]nly prudential ripeness is of concern here." (Defs.' Mem. 13.) In this prudential sense, ripeness is simply "a tool that courts may use to enhance the accuracy of their decisions and to avoid becoming embroiled in adjudications that may later turn out to be unnecessary." *Simmonds v. I.N.S.*, 326 F.3d 351, 357 (2d Cir. 2003) (citation omitted). In the context of declaratory

judgments, courts generally find that a claim is prudentially ripe where "the judgment will serve a useful purpose in clarifying and settling the legal relations in issue or will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Pilkington N. Am., Inc. v. Mitsui Sumitomo Ins. Co. of Am.*, —F. Supp. 3d—, 2020 WL 2521562, at *12 (S.D.N.Y. May 18, 2020) (citation and quotation marks omitted).

With respect to insurance disputes, "[c]ourts often distinguish between the duty to defend and the duty to indemnify in determining whether each issue posed in a declaratory judgment action is ripe for adjudication, because the duties are usually triggered by different conditions." *Lafarge*, 2018 WL 1634135, at *4 (citation and quotation marks omitted). Courts may, therefore, "issue a declaratory judgment on the duty to defend, while holding that the duty to indemnify is not ripe for adjudication." *Atl. Cas. Ins.*, 918 F. Supp. 2d at 261. However, "[t]here is no per se rule . . . that all declaratory judgment actions brought to establish a duty to indemnify are premature during the pendency of an underlying action." *Id.* (italics omitted); *see also Lafarge*, 2018 WL 1634135, at *5 ("There is no per se rule that underlying liability must be established before a court may rule on a declaratory action to establish the duty to indemnify." (citation, italics, and quotation marks omitted)). Accordingly, where "a decision on the duty to defend . . . produce[s] a definite answer with respect to the duty to indemnify," or where "questions about insurance coverage . . . can be separated from the issues of liability and causation that are being litigated in the underlying lawsuit," courts may declare that an insurer has no duty to indemnify as well. *Atl. Cas. Ins.*, 918 F. Supp. 2d at 261; *see also Columbia Cas. Co. v. Georgia & Fla. RailNet, Inc.*, 542 F.3d 106, 111 (5th Cir. 2008) (noting that a court may declare that an insurer has no duty to indemnify when the lack of such duty is apparent for the same reason there is no duty to defend).

As the Court's analysis of the Policy and S&R's claims has demonstrated, there is no prudential reason to delay proceedings in this case.  By its express terms, the Policy excludes from coverage all claims in the Underlying Action.  The exclusion does not turn on facts to be determined in the Underlying Action.  Rather, the exclusion is the inexorable result of the Policy's clear language, and the relationship between the claims raised in the Underlying Action and those raised in S&R's previous lawsuits.  In other words, the instant Action is a paradigmatic example of a case where "questions about insurance coverage . . . can be separated from the issues of liability and causation that are being litigated in the underlying lawsuit."  *Atl. Cas. Ins.*, 918 F. Supp. 2d at 261.  Moreover, the Court concludes that "the judgment will serve a useful purpose in clarifying and settling the legal relations in issue" and "will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding."  *Pilkington N. Am., Inc.*, 2020 WL 2521562, at *12 (citation and quotation marks omitted).  In particular, the Parties will be free from uncertainty concerning whether Plaintiff must defend (and ultimately may have to indemnify) Defendants.  *See Cont'l Cas. Co. v. Coastal Sav. Bank*, 977 F.2d 734, 738 (2d Cir. 1992) ("A declaratory judgment as to coverage will terminate and afford relief from the uncertainty that the insurers face as to coverage." (citation omitted)); *Lafarge*, 2018 WL 1634135, at *8 (explaining that insurance cases "can present appropriate circumstances for declaratory relief, because parties often find it useful to know their rights, duties, or vulnerabilities in advance of an underlying judgment" (citation omitted)).  Accordingly, the Court declines to dismiss or stay the case on prudential ripeness grounds.[13]

---

[13] The Court notes that its decision is based on the Policy and public documents in the Underlying Action and prior lawsuits, and does not rely on any additional allegations contained in the Complaint.  Accordingly, the instant decision's preclusive effects in subsequent proceedings in this Action will likely be substantial.  The Parties should consider these effects carefully prior to engaging in further motions practice.

## III. Conclusion

For the foregoing reasons, the Motion is denied.  The Clerk of the Court is respectfully

requested to terminate the pending motion, (Dkt. Nos. 14, 27).

SO ORDERED.

DATED:     September 23, 2020
           White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

27